# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| PAUL J. BUSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:09cv1742 CAS |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Paul J. Busby (Plaintiff) disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and social security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

Plaintiff applied for DIB and SSI in March 2007, alleging that he was disabled as of May 1, 2006, because of heart problems and diabetes mellitus. (R.[1] at 82-85, 88-90.) His

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

applications were denied initially and after a hearing held in November 2008 before Administrative Law Judge (ALJ) James E. Seiler. (Id. at 9-53.) After reviewing additional medical records, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he was then 49 years old, weighed 223 pounds, and was 5 feet 9 inches tall. (Id. at 24.) He is right-handed. (Id.) He lives with his 25-year old daughter in a mobile home. (Id. at 24-25.) They had been living with his stepmother at her house until they were evicted two months earlier. (Id. at 25.) Plaintiff completed the eighth grade, when he was sixteen years old, and had never obtained a General Equivalency Degree, although he had tried three times. (Id.) He had had to repeat the sixth and seventh grades, but had never received any special education services. (Id. at 26.) He can read, but does not understand what he has read. (Id.) He does understand the sports section of the newspaper. (Id. at 27.) He can do multiplication and division, but has problems with fractions and decimals. (Id.) He can write a phone message. (Id.)

Plaintiff last worked in May 2006. (Id.) He was working then as an automobile mechanic, as he had since he was 18 years old. (Id. at 28.) The job ended when he swore at his boss after his boss refused to pay him for funeral leave when his father died. (Id.) The way the job ended reflected his problems with anger management. (Id. at 29.)

Asked what medical problems prevent him from working, Plaintiff explained that, in addition to his anger issues, he has heart trouble, diabetes, a bad knee, and a swollen right ankle. (<u>Id.</u>) His worst problem is his anger. (<u>Id.</u>) He is being treated for that by Dr. Vaid,[2] who has prescribed Xanax for him for the past two to three years. (<u>Id.</u>) The anger problems arise when he does not agree with something someone says and happen approximately once a month. (<u>Id.</u>) When he does get angry, he threatens the other person with a fight, but never does fight. (<u>Id.</u> at 30.) The last episode was around his birthday in mid-September when his stepmother refused to give him some things that had belonged to his father. (<u>Id.</u>)

Plaintiff has worked for a number of automobile dealers. (<u>Id.</u>) Although he had not had any anger issues at most of his jobs, he had been told that he was constantly loud. (<u>Id.</u>)

He does not receive any counseling for his anger issues. (<u>Id.</u> at 30-31.)

His heart problems cause chest pain approximately once a month. (<u>Id.</u> at 31.) The episodes last at most fifteen minutes and are relieved by him sitting down and resting. (<u>Id.</u>) Sometimes, he takes Vicodin to relieve the pain. (<u>Id.</u>) He has been on Vicodin for two to three years. (<u>Id.</u>) It was not prescribed for his heart problem, but was for his knee, ankle, arm, and occasional back pain. (<u>Id.</u> at 31-32.) His heart problem makes him breathe hard and causes him to be short of breath. (<u>Id.</u> at 32.) When he walks longer than he should, which is approximately five minutes, he has to sit down because he gets out of breath. (<u>Id.</u>) The chest pains are not predictable and can occur even when he is sitting down and watching

---

[2]Where, as here, there is a conflict between the spelling of a name in the hearing transcript and in the medical records, the Court will employ the spelling used in the medical records. Thus, although the transcript refers to Dr. "Vague," the Court uses "Vaid."

television.  (Id.)  He had stents placed in his heart in January 2007, but did not notice any change afterwards.  (Id. at 33.)  A month after the stents were placed, he went to the emergency room because he thought he was having a heart attack.  (Id.)  It was pneumonia.  (Id.)  The last time he was in the emergency room, the doctors found a 30 percent blockage on his right side.  (Id.)

Plaintiff further testified that his right knee hurts and swells so much that he can hardly walk.  (Id. at 34.)  This happens approximately once a month.  (Id.)  Surgery has been suggested, but he is afraid that it will interfere with his diabetes.  (Id.)  Vicodin helps with the knee problem.  (Id.)  Also, he sometimes uses a brace on the knee.  (Id. at 35.)

His problem with his right ankle is separate from the one with his right knee.  (Id.)  Once every couple of months, his ankle swells so badly that he cannot put a shoe on or walk.  (Id.)  His doctors think the problem is attributable to his diabetes.  (Id. at 35-36.)  He also takes Vicodin and uses a brace to try to relieve the ankle pain.  (Id. at 36.)

Plaintiff takes insulin for his diabetes.  (Id.)

A couple of times a month, Plaintiff has back pain.  (Id. at 37.)  He takes pills and a hot shower to relieve the pain.  (Id.)  The pain can occur even when he is sitting.  (Id.)

Plaintiff drives a car, but has a hard time seeing at night.  (Id. at 38.)

The longest he can stand is for ten to fifteen minutes.  (Id.)  His feet, knee, and leg will start hurting after that.  (Id.)  The longest he can sit is for approximately ninety minutes before he has to stand up and move around.  (Id.)

Plaintiff visits friends or relatives every day.  (Id. at 39.)  He does not attend church or any club meetings.  (Id.)  He has no problem with personal grooming.  (Id.)  He bathes and changes clothes daily and eats regular meals.  (Id. at 41.)  He performs some household chores; for instance, he cleans up after they eat, sometimes cooks dinner, vacuums, and does the laundry.  (Id. at 39.)  He can not do any of these chores for as long as he used to, but has to take breaks when he gets tired.  (Id. at 39-40.)  When he and his daughter go grocery shopping, he gets a few things and then sits and waits for her.  (Id. at 40.)

Plaintiff sleeps for no longer than two hours at a time.  (Id.)  He was supposed to have a sleep study, but the sessions keep getting cancelled.  (Id.)

Plaintiff had a problem with alcohol twenty-five years earlier.  (Id. at 42.)  Now, he sometimes drinks two beers.  (Id.)  He had a problem using cocaine in 2005, but has not used any since November of that year.  (Id. at 43.)  He is not on a diabetic diet and has not been given one.  (Id. at 42.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers, and several assessments.

When applying for DIB and SSI, Plaintiff completed a Function Report.  (Id. at 112-19.)  Asked to describe his day, he reported that he gets up, makes his bed, takes his medication, makes breakfast, watches television, takes walks, reads the paper and books, eats lunch, watches television, takes walks, takes a nap, makes dinner, watches television, goes

to a friend's house, and goes to bed.  (<u>Id.</u> at 112.)  He does not take care of anyone else or of any pets.  (<u>Id.</u> at 113.)  He has no problems with personal grooming tasks and does not need any reminders to perform those tasks or to take his medication.  (<u>Id.</u> at 113-14.)  The meals he prepares are sandwiches, hamburgers, and similar foods.  (<u>Id.</u> at 114.)  It takes him twenty minutes to prepare these meals.  (<u>Id.</u>)  He does such household chores as cleaning, laundry, and mowing the yard.  (<u>Id.</u>)  The first two take two hours; the last take one and one-half hours.  (<u>Id.</u>)  Once a week for an hour, he goes grocery shopping.  (<u>Id.</u> at 115.)  He can, and does, drive.  (<u>Id.</u>)  His hobbies include watching television and walking at the mall; his social activities include going to friends' houses four times a week.  (<u>Id.</u> at 116.)  Since his impairments began, he does not play any sports and does not like to be in crowds.  (<u>Id.</u> at 117.)  His impairments affect his ability to lift, stand, reach, walk, kneel, see, and get along with others.  (<u>Id.</u>)  He can only lift forty pounds and can only walk four blocks before having to rest for twenty minutes.  (<u>Id.</u>)  He can, however, pay attention and finish what he starts.  (<u>Id.</u>)  He follows instructions, both written and spoken, well and gets along well with authority figures.  (<u>Id.</u> at 117-18.)  He was fired from one job because of his diabetes and stress.  (<u>Id.</u> at 118.)

Plaintiff also completed a Disability Report.  (<u>Id.</u> at 120-28.)  Diabetes and heart problems limit his ability to work.  (<u>Id.</u> at 121.)  Specifically, he can not stand up all day and his knees and chest hurt if he stands too long.  (<u>Id.</u>)  His impairments first caused him pain in May 2006 and prevented him from working at the same time.  (<u>Id.</u>)  He was let go by his employer on May 1, 2006, when he became sick.  (<u>Id.</u>)  He had worked as an automobile

technician from 1991 to 2006. (Id. at 122.) The heaviest weight he lifted in this job was 100 pounds or more; the weight he frequently lifted was 50 to 100 pounds. (Id.) Doing this job, he walked a total of 1.5 hours and stood a total of 6.5 hours during an eight-hour day. (Id.) He had to stoop for a total of 3.5 hours, kneel for a total of 1.25 hours, and crouch for a total of 2.5 hours. (Id.) His doctors include Dr. Al-Joundi, a cardiologist, Dr. George Thampy, an endocrinologist, and Dr. Brij R. Vaid. (Id. at 123-24.) His medications include Alprazolam (an anti-depressant), aspirin, hydrocodone (a pain reliever), Metropolol (a beta-blocker for the treatment of hypertension), Naproxen (a nonsteroidal anti-inflammatory drug for the relief of mild to moderate pain), Novolog (insulin), Pepcid, Plavix (to reduce heart disease), Prinivil, see page 19, below, and Zocor, see page 15, below. (Id. at 125.) He had completed the ninth grade, and had had no vocational, trade, or special job training. (Id. at 126.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal form. (Id. at 132-38.) He reported that there had been no changes, for better or worse, in his impairments since he had completed the initial report and there were no new impairments. (Id. at 133.) His medications remained the same. (Id. at 134.) There were also no changes in his daily activities. (Id. at 136.)

Plaintiff had reported earnings from 1976 to 2006. (Id. at 96.) During his last five years of full employment, Plaintiff averaged $40,628 in annual earnings. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff was admitted to St. Anthony's Medical Center (St. Anthony's) on November 5, 2005, after experiencing a sudden onset of chest pain, dizziness, weakness, and abdominal pain.  (Id. at 258-73, 328-30.)  When at the emergency room, he had acidosis[3] and uncontrolled hyperglycemia.  (Id. at 262.)  He had been abusing cocaine that day and had been inhaling cocaine every week for at least a year.  (Id. at 263.)  It was noted that he had not seen a physician in the last several years.  (Id.)  He did not smoke, but did drink at least ten beers a day on Friday, Saturday, and Sunday and two beers on the other days.  (Id.)  He was not currently taking any medication.  (Id.)  He was diagnosed with diabetes and hypertension and was to have a cardiology consultation.  (Id. at 264.)  The consultation ruled him out for myocardial infarction.  (Id. at 268.)  An electrocardiogram (ECG) revealed a dilated left ventricle and a left ventricular ejection fraction (LVEF) of 55 to 65%.  (Id. at 269.)  The left ventricular wall thickness was mildly increased and the left atrium was mildly dilated.  (Id.)  His discharge diagnosis on November 7 was diabetes mellitus; angina equivalent; abdominal pain secondary to probable diabetic ketoacidosis; resolved, hypertension; alcohol dependence; and substance abuse.  (Id. at 262.)  He was to follow up with a cardiologist and endocrinologist.  (Id. at 262, 328.)

On November 10, Plaintiff saw a cardiologist, Bassam Al-Joundi, M.D., with Gateway Cardiology, P.C.  (Id. at 146-50, 185-88.)  He reported having "some atypical chest

_____

[3]Acidosis is "[a] state characterized by actual or relative decrease of alkali in body fluids in relation to the acid content . . . ."  Stedman's Medical Dictionary, 15 (26th ed. 1995).  Diabetic ketoacidosis (the enhanced production of ketone bodies) is a cause of acidosis.  Merck Manual of Diagnosis and Therapy, 1021 (16th ed. 1992).

complaints, but no chest pain." (Id. at 149.)  He had no dyspnea, or shortness of breath, on exertion and no lower extremity pain or swelling.  (Id.)  He had had some palpitations, but had not had experienced dizziness or syncope (loss of consciousness).  (Id.)  His gait was normal, as was his affect.  (Id. at 150.)  He was alert and oriented times three.  (Id.)  He had a normal resting ECG.  (Id. at 146.)  Stress test results revealed a normal functional capacity and a normal resting blood pressure.  (Id.)  His heart rate response was attenuated due to the medication.  (Id.)  He had no chest pain and no arrhythmias.  (Id.)  Perfusion testing showed a fixed, inferior defect.  (Id.)  There was no left ventricular dilation; wall motion analysis was normal.  (Id.)  His ejection fraction was 53%, consistent with normal left ventricular function. (Id.)  His hypertension was to continue being treated under the current therapy and his potential for coronary artery disease was to continue to be followed-up on an out-patient basis.  (Id. at 150.)  He was to return in three to four months.  (Id. at 146.)

Plaintiff first consulted Brij R. Vaid, M.D., an internist, on November 22 after twisting his right ankle four days earlier.  (Id. at 174-76.)  He also reported having had chest pain beginning two days earlier.  (Id. at 174.)  His medical history was remarkable for diabetes, hypertension, and headaches.  (Id.)

The same day, he saw K. George Thampy, M.D., Ph.D., the endocrinologist who had consulted on the case when he was hospitalized earlier in the month.  (Id. at 326-27.)  Dr. Thampy noted that Plaintiff's glucose value was 111, down from 541 when he was admitted to St. Anthony's.  (Id. at 326.)  His current symptoms included excessive fatigue.  (Id.)

Plaintiff was to take 25 units of insulin, Novolog Mix 70/30,[4] before breakfast and 20 units before supper.  (Id. at 327.)  He was to exercise, reduce his caloric intake, and learn carbohydrate counting.  (Id.)  He was also to monitor his glucose values and was to email those values once a week.  (Id.)

Plaintiff's right ankle pain and swelling had resolved when he next saw Dr. Vaid on January 18, 2006.  (Id. at 172-73.)

Plaintiff followed-up with another physician at Gateway Cardiology, Nizar A. Assi, M.D., on April 20.  (Id. at 151-52, 179-80.)  He had had no chest pain, shortness of breath, nausea, vomiting, or dizziness.  (Id. at 151.)  Other than snoring and mood changes, he remained the same as before.  (Id.)  His gait was steady; his affect was normal.  (Id. at 152.)  He was described as being "stable without signs or symptoms of angina or congestive heart failure."  (Id.)  He was advised of his coronary artery disease risk factors and encouraged to exercise.  (Id.)  He did not want to follow-up with cardiology, so was advised to follow up with his primary care physician as needed.  (Id.)

Plaintiff returned to Dr. Thampy for a follow-up visit on May 17.  (Id. at 316-18.)  Although excessive fatigue was listed as a symptom, "fatigue" was not circled on a Patient History Questionnaire.  (Id. at 316, 318.)  "Swollen ankles," "[m]uscle aches," "[n]umbness of arms," and "[n]ervous" were circled.  (Id. at 318.)  He appeared well, was alert and oriented

---

[4]The "70/30" refers to the 70% of the insulin analog premix that is long-acting and the 30% that is rapid-acting insulin aspart.  mediLexicon: Novolog Mix 70/30, http://www.medilexicon.com/drugs/novolog_mix_70_30.php (last visited Oct. 27, 2010).

times three, was not depressed, was pleasant and cooperative, and had a good affect.  (<u>Id.</u> at 316.)  The number of units of Novolog he was to take remained as before.  (<u>Id.</u> at 317.)

Dr. Vaid added anxiety to Plaintiff's previous diagnoses of hypertension, diabetes mellitus, and gout when he saw him on August 30.  (<u>Id.</u> at 170-71, 303-04.)  Lexapro, an anti-depressant, was prescribed.  (<u>Id.</u> at 171.)

Plaintiff returned to Dr. Vaid on September 18 with complaints of a swollen and painful left ankle and painful leg calf.  (<u>Id.</u> at 168-69, 301-02.)  The pain was still present at the next two visits, one on September 29 and the next on October 25.  (<u>Id.</u> at 164-67, 297-300.)  Plaintiff reported to Joy Boyer-Metts, a family nurse practitioner in Dr. Vaid's office, at his November 22 visit that his left ankle was better.  (<u>Id.</u> at 162-63, 295-96.)  On December 20, however, he reported that the ankle pain was bad with the cold weather.  (<u>Id.</u> at 160-61, 293-94.)

In addition to seeing Dr. Vaid on October 25, Plaintiff saw Dr. Thampy.  (<u>Id.</u> at 313-15.)  On the questionnaire, he circled that he had gained weight but did not circle any of the other symptoms.  (<u>Id.</u> at 315.)  He had gained seven pounds since his last visit and now weighed 227 pounds.  (<u>Id.</u> at 313.)  It was noted that his excessive fatigue had improved.  (<u>Id.</u>)  He was to continue with the same number of units of Novolog and was to return in six months.  (<u>Id.</u> at 314.)

Plaintiff consulted Dr. Vaid on January 23, 2007, after vomiting and having diarrhea for two days.  (<u>Id.</u> at 158-59, 291-92.)  He also complained of chest pain.  (<u>Id.</u> at 158.)  A chest x-ray showed no active cardiopulmonary disease.  (<u>Id.</u> at 255.)  Xanax, prescribed for

the treatment of anxiety disorders, was included in his prescriptions; no mental impairment was included in his diagnoses. (Id. at 158-59.)

Because of the chest pain, however, Plaintiff then went to St. Anthony's with complaints of a cough and of chest pain on his left side. (Id. at 241-57, 323-24.) He was described as working as an automobile mechanic full-time. (Id. at 323.) He did not have a history of tobacco or illegal drug abuse. (Id.) Since his initial diagnosis of diabetes, he had not had any ketoacidosis and had no symptoms of hypothyroidism or hyperthyroidism. (Id.) His weight was stable and his appetite was normal. (Id.) He took insulin twice daily. (Id.) A myocardial infarction was ruled out. (Id. at 245.) Myocardial perfusion testing revealed a reversible proximal septal wall perfusion defect with hypokinesis suspicious for exercise-induced ischemia and a LVEF of 59%. (Id. at 256-57.) After undergoing a percutaneous transluminal coronary angioplasty with the placement of two stents, Plaintiff's chest pain was better. (Id. at 245-48.) He was discharged two days after admission. (Id. at 241, 245.) In addition to various medications, he was placed on a 2000 calorie American Diabetes Association (ADA) diet. (Id. at 245.)

On January 31, Plaintiff was admitted to St. Anthony's from the emergency room and was treated for acute influenza. (Id. at 226-34.) He was discharged two days later. (Id. at 226.)

On March 8, Plaintiff saw Dr. Vaid for a swollen and painful right knee. (Id. at 156-57, 289-90.) X-rays revealed no evidence of joint effusion, joint space narrowing, or spurring. (Id. at 225, 235.) The knee was better one week later. (Id. at 154-55, 287-89.)

Plaintiff was seen by Tammam Al-Joundi, M.D., with Gateway Cardiology, on April 2 for complaints of recurrent, sporadic left-sided chest pain lasting for a few minutes.  (Id. at 177-78, 195-96, 379-80.)  The pain had been occurring for the past three days and had no aggravating or relieving factors.  (Id. at 177.)  Plaintiff thought he might have pulled a muscle when working at his house.  (Id.)  He also complained of increased fatigue.  (Id.)  On examination, he had a regular heart rate and rhythm without any murmur.  (Id. at 178.)  Dr. Al-Joundi assessed Plaintiff as having coronary artery disease, chest pain syndrome, hypertension, hyperlipidemia, and diabetes mellitus.  (Id.)  He opined that Plaintiff had "some atypical features with his chest pain."  (Id.)  Given his history of coronary artery disease and his recent coronary intervention, however, Dr. Al-Joundi recommended that Plaintiff undergo a stress test.  (Id.)

Three days later, Plaintiff had a stress test and an ECG.  (Id. at 181-84, 192-94, 197, 371-74.)  His ejection fraction was 66%.  (Id. at 181.)  The ECG revealed a mild anterior basal wall hypokinesis with preserved overall left ventricular systolic function, mild left ventricular enlargement and hypertrophy, mild aortic root dilation and sclerosis, mild aortic insufficiency, mild mitral regurgitation, mild tricuspid regurgitation, mild pulmonary hypertension, and normal pulmonic valve velocities.  (Id.)  The stress test revealed a stress LVEF of 61%, moderate fixed nontransmural inferior-posterior defect, diaghramatic attenuation, and nondiagnostic ST changes for ischemia.[5]  (Id. at 182.)  The recommendation

_____

[5]An ECG is the recorded tracing of the electrical activity generated by the heart.  Richard E. Klabunde, Ph.D., Cardiovascular Physiology Concepts: Electrocardiogram (EKG, ECG), http://www.cvphysiology.com/Arrhythmias/A009.htm (last visited Oct. 27, 2010).  "ST" refers to that segment

was that Plaintiff continue with his beta-blocker and medical therapies and follow-up in three months.  (Id.)

On April 19, Plaintiff's monthly visit to Dr. Vaid's office concerned right knee pain. (Id. at 285-86.)

The following week, Plaintiff had a follow-up visit with Dr. Thampy.  (Id. at 311-12.) He complained of back and knee pain and informed Dr. Thampy that he had suffered a myocardial infarction the previous January and had had two stents placed.  (Id. at 311.)  He appeared well, was alert and oriented times three, and was not depressed.  (Id.)  The number of units of Novolog he was to take remained the same.  (Id. at 312.)  He was to return in six months.  (Id.)

Plaintiff reported to Boyer-Metts on May 17 that his arms, right knee, and back hurt; he had run out of pain medication.  (Id. at 283-84.)  He was given refills of Vicodin and Xanax and continued on his other medications.  (Id. at 284.)  When he saw her again on June 14 he had back pain and pain in the third toe on his left foot after dropping a brick on it three weeks earlier.  (Id. at 281-82.)  He was told to wrap the toe and elevate his leg.  (Id. at 282.)

Plaintiff complained to Dr. Vaid on July 26 about knee and back pain.  (Id. at 279-80.)

The same day, he saw Dr. Thampy and was described as having a normal gait, muscle tone, and strength.  (Id. at 309-10.)  His weight was stable.  (Id. at 309.)  Although the number of units of Novolog remained unchanged, he was to return in three months.  (Id. at 310.)

_____

during "the entire ventricle is depolarized and roughly corresponds to the plateau phase of the ventricular action potential."  Id.  This segment is important in diagnosing ventricular ischemia or hypoxia.  Id.

On August 27, Plaintiff reported to Boyer-Metts that everything had seemed okay when he had had his stress test three months earlier. (Id. at 277-78.) He was having chest pain once or twice a month; his chest hurt when he pressed it. (Id. at 277.) He was to follow-up with Dr. Al-Joundi. (Id. at 278.)

Plaintiff saw Boyer-Metts again at his September 24 visit. (Id. at 275-76.) The back of his thighs hurt after playing golf the previous Saturday. (Id. at 275.) He had not yet followed up with Gateway Cardiology. (Id.) To do so and to diet and exercise were included in the treatment recommendations. (Id. at 276.)

Plaintiff returned to Dr. Vaid on October 25. (Id. at 273-74.) His gait was normal, but his back was tender. (Id. at 274.)

Plaintiff also saw Dr. Thampy on October 25. (Id. at 306-08.) He was described as appearing well. (Id. at 306.) He complained of pain in his back, feet, and knees and of nocturia (urinating at night), polyuria (excessive urination), polydipsia (excessive thirst), difficulty sleeping, and occasional fatigue. (Id.) He had gained four pounds since his last visit. (Id.) He was to continue taking the same number of units of Novolog and was to return in six months. (Id. at 308.)

Plaintiff returned to Gateway Cardiology on December 3 for a follow-up visit. (Id. at 381-82.) His only complaint was of mild shortness of breath on exercise. (Id. at 381.) He was not depressed. (Id. at 382.) He had recently discontinued taking Zocor, prescribed for lowering cholesterol, and his low-density lipoprotein (LDL) levels were "somewhat elevated." (Id. at 381-82.) His coronary artery disease and his hypertension were both controlled. (Id.

at 382.)  He was to restart the Zocor and follow-up with Dr. Vaid in six to eight weeks for a lipid profile.  (Id.)

On December 20, Plaintiff saw Boyer-Metts for swelling in his right foot and for ear drainage.  (Id. at 435-39.)

Two weeks later, on January 3, 2008, his right foot was still painful and swollen.  (Id. at 430-34.)  One week later, Plaintiff's left foot was also swollen.  (Id. at 425-29.)  He had a normal gait.  (Id. at 427.)  An x-ray of his left foot revealed only calcaneal spurring.  (Id. at 445.)  Blood tests showed high glucose levels.  (Id. at 443.)  The next week, on January 17, Plaintiff reported to Boyer-Metts that the swelling in both feet came and went. (Id. at 420-24.)  That day, the swelling was down.  (Id. at 420.)  His gait was normal.  (Id. at 422.)  A magnetic resonance imaging (MRI) revealed osteoarthritis in his first metatarsophalangeal, a small region of focal marrow in the talus, and hypointensity in the first proximal and distal phalanges.  (Id. at 441-42.)

At his February 13 visit to Dr. Vaid's office, Plaintiff reported that his ankle pain was better and he was to see an orthopedist for boots.  (Id. at 415-19.)  His cholesterol levels were high; he was advised to follow a low cholesterol diet.  (Id. at 419.)  Included in the list of diagnoses was low back pain/degenerative joint disease.  (Id.)

Complaining of intermittent left arm pain that radiated to his chest and high blood pressure, Plaintiff went to the emergency room at St. Anthony's on February 25.  (Id. at 354-67.)  A myocardial infarction was ruled out.  (Id. at 363.)  The cardiologist thought Plaintiff should have a stress test.  (Id.)  Plaintiff was discharged with instructions to do so.  (Id.)

Depression was included in the list of diagnoses. (Id.) Plaintiff had the stress test. (Id. at 375-78.) He had a stress LVEF of 52%. (Id. at 375.) He also had no reversible defects; a small to moderate, fixed, nontransmural inferior wall defect; normal left ventricular function; no changes to suggest ischemia; and good exercise tolerance. (Id.) Liwa T. Younis, M.D., a cardiologist with Gateway Cardiology, recommended a follow-up appointment in four to six weeks and a continuation of his beta-blocker and medical therapies. (Id. at 376.)

Plaintiff complained again of ankle pain when he saw Dr. Vaid on March 13. (Id. at 410-14.) As before, his gait was normal. (Id. at 412.)

Plaintiff was next seen in Dr. Vaid's office on June 4. (Id. at 405-09.) It was noted that he had been out of town. (Id. at 405.) He had a rash on both arms caused by laundry detergent and was diagnosed with allergic dermatitis. (Id. at 405, 409.) For the first time in Dr. Vaid's notes, he was noted to be anxious. (Id. at 406.) He was not, however, depressed. (Id.)

On June 16, Plaintiff went to the St. Anthony's emergency room with complaints of chest pain that had begun at least a week before. (Id. at 337-46.) He described the pain as sharp and intermittent and as starting on his right side and radiating across his chest and into his back and right shoulder. (Id. at 344.) He did not have any nausea, vomiting, or weakness, but did have shortness of breath. (Id.) Plaintiff was admitted to the hospital. (Id.) He was thought to be experiencing angina, but a left heart catheterization was unremarkable. (Id. at 347.) It was noted that he had snorted cocaine ten years earlier. (Id. at 348.) Three days after admission, Plaintiff was discharged with a diagnosis of noncardiac chest pain. (Id. at 347-53.)

His activity on discharge was to be as tolerated.  (Id. at 347.)  He was to follow an 1800 calorie ADA diet.  (Id.)

Plaintiff saw Boyer-Metts on July 2 as a follow-up visit from his hospitalization.  (Id. at 400-04.)

The next week, he followed-up with Dr. Thampy.  (Id. at 368-70.)  Plaintiff complained of pain in his back, feet, and knees, noctuid, pillory, polydipsia, difficulty sleeping, and occasional fatigue.  (Id. at 368.)  He was in no apparent distress and was not depressed.  (Id.)  He had a normal muscle tone, strength, and gait.  (Id.)  He did not have any difficulty standing.  (Id.)  He was to take seven units of Novolog at each of his three meals, plus a specified additional amount depending on his blood sugar levels.  (Id. at 370.)  He was also to take twenty units of Levemir, a long-acting form of insulin, in the evening.  (Id.)

On August 11, he complained to Boyer-Metts of back and right knee pain; he was out of pain medication.  (Id. at 395-99.)

The next month, he complained of neck and shoulder pain that had begun the afternoon before and was causing a decrease in his range of motion.  (Id. at 390-94.)  The left side of his face tingled; however, it was better as of that morning.  (Id. at 390.)  He was having difficulty sleeping.  (Id.)  An ECG was conducted, and showed no significant abnormalities.  (Id. at 394, 440.)

After a follow-up visit to Gateway Cardiology on September 18, Plaintiff's dosage of lisinopril (Prinivil), prescribed for the treatment of hypertension, was increased because his blood pressure was elevated.  (Id. at 383-84.)  It was noted that he appeared to have no chest

pain, dyspnea, PND (paroxysmal dyspnea or sudden, severe shortness of breath during sleep), or orthopnea (shortness of breath when lying flat).  (Id. at 383.)  He was to return in six months.  (Id. at 384.)

That same day, he reported to Boyer-Metts that his neck and shoulder pain was better. (Id. at 385-89.)  He was anxious.  (Id. at 385.)

The ALJ also had before him various assessments of Plaintiff's physical and mental functional capacities.

A Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff was completed by a non-examining consultant with the Missouri Section of Disability Determinations in May 2007.  (Id. at 198-203.)  The primary diagnoses were coronary artery disease and chest pain syndrome; diabetes mellitus; the secondary diagnoses were hypertension, hyperlipidemia, and diabetes mellitus. (Id. at 198.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 199.)  His ability to push or pull was unlimited other than these lifting and carrying restrictions.  (Id.)  He had postural limitations of no frequent climbing, stooping, kneeling, crouching or crawling and only occasional balancing.  (Id. at 201.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 201-02.)

The same month, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 204-14.)  He was described as having an anxiety-related disorder that was not severe.  (Id. at 204, 208.)  This disorder did not result in any restrictions

of activities of daily living, any difficulties in maintaining social functioning, any difficulties in maintaining concentration, persistence, or pace, or in any repeated episodes of decompensation of extended duration. (<u>Id.</u> at 212.)

On January 7, 2008, Dr. Younis, with Gateway Cardiology, rated Plaintiff's heart disease as Class II. (<u>Id.</u> at 331.) Heart diseases in this classification are described as "resulting in slight limitation of physical activity. [Patients] are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." (<u>Id.</u>)

A family nurse practitioner at Gateway Cardiology completed a Cardiac Residual Functional Capacity Questionnaire for Plaintiff the same day. (<u>Id.</u> at 332-36.) Plaintiff's prognosis was "good." (<u>Id.</u> at 332) His symptoms included chest pain, edema, shortness of breath with activity, and fatigue. (<u>Id.</u>) He was not a malinger. (<u>Id.</u> at 333.) Psychological stress increased his symptoms; Xanax gave him some relief. (<u>Id.</u>) He could tolerate moderate work stress. (<u>Id.</u>) The nurse practitioner marked that Plaintiff's physical symptoms and limitations caused him emotional difficulties such as depression or chronic anxiety, but did not explain as requested. (<u>Id.</u>) Emotional factors contributed to the severity of Plaintiff's subjective symptoms and functional limitations. (<u>Id.</u>) Side effects from his medication included tiredness and occasional dizziness. (<u>Id.</u> at 334.) His impairments, which could be expected to last at least twelve months, prevented him from walking farther than two blocks without having to rest or experience severe pain and from standing or walking two hours or more. (<u>Id.</u>) He could sit for at least six hours, but would need a job that permitted him to shift positions at will. (<u>Id.</u>) He would need to take three to four unscheduled breaks during

an eight-hour work day; those breaks would need to last between fifteen and twenty minutes and would have to consist of him sitting quietly. (<u>Id.</u>) He did not need to elevate his legs with prolonged sitting. (<u>Id.</u>) Plaintiff could frequently lift less than ten pounds, occasionally lift twenty pounds, and rarely lift fifty pounds. (<u>Id.</u> at 335.) He could only occasionally bend or climb stairs and should never crouch, squat, or climb ladders. (<u>Id.</u>) He should avoid even moderate exposure to extreme cold and heat, high humidity, solvents, chemicals, fumes, odors, and gases. (<u>Id.</u>) He should avoid concentrated exposure to wetness, cigarette smoke, perfumes, soldering fluxes, and dust. (<u>Id.</u>) He was likely to have "good days" and "bad days" with his impairments and would likely be absent from work four days per month. (<u>Id.</u> at 336.) Asked what was the earliest date that the questionnaire answers applied, the response was January 2007. (<u>Id.</u>)

## <u>The ALJ's Decision</u>

After outlining the Commissioner's five-step sequential evaluation process, the ALJ found at step one that Plaintiff met the requirements for DIB through December 31, 2011, and at step two, that he had not engaged in substantial gainful activity since the alleged onset date. (<u>Id.</u> at 13-14.)

The ALJ next found at step three that Plaintiff had severe impairments of coronary artery disease treated with stenting, hypertension, hyperlipidemia, osteoarthritis, and diabetes mellitus. (<u>Id.</u> at 14.) He did not, however, have a severe mental impairment. (<u>Id.</u>) He had not been hospitalized for a psychiatric problem and was not being treated by a psychiatrist, psychologist, or mental health counselor. (<u>Id.</u>) Moreover, a number of examinations had

described him as having a normal mood and affect.  (Id.)  The severe impairments that Plaintiff did have did not meet or medically equal, singly or in combination, an impairment of listing-level severity.  (Id. at 15.)  Specifically, he did not meet Listing 9.08 for diabetes mellitus because he did not have neuropathy, the required frequency of acidosis, or the required degree of retinitis proliferans.[6]  (Id.)  He did not meet Listing 1.04 for disorders of the spine because he did not have "nerve root compression in a neuro-anatomic distribution with motor, sensory or reflex loss, or spinal arachnoiditis confirmed by operative note or pathology report or lumbar spinal stenosis."  (Id.)  He also did not meet Listing 1.02 for a major dysfunction of a joint or any of the cardiac listings in Section 4.00.  (Id.)

Addressing Plaintiff's residual functional capacity (RFC), the ALJ evaluated his credibility and the medical evidence, including the opinion evidence.  (Id. at 15-19.)  After summarizing Plaintiff's hearing testimony, the ALJ noted that an examination shortly before his alleged onset date was inconsistent with that testimony, e.g., Plaintiff testified he could hardly walk but he had a steady gait and was advised to exercise and he testified his worst problem was his anger but he had a normal affect.  (Id. at 16-17.)  The ALJ also noted that Plaintiff's recent cardiac treatment showing that he had no chest pain, orthopnea, or PND was inconsistent with his allegations of disabling shortness of breath.  (Id. at 17.)  His stress tests and recent cardiac catherization also did not support his claim of disabling cardiac conditions. (Id.)  The ALJ discounted the finding that Plaintiff had a Class II heart disease, describing the

---

[6]Retinitis proliferans, or proliferative retinopathy, "is characterized by new vessel formation . . . and scarring" and is associated with diabetic retinopathy.  Merck Manual of Diagnosis and Therapy, 2384 (16th ed. 1992).

finding as "an unexplained conclusory checkmark unsupported by objective data." (Id.) The ALJ also discounted the assessment of the family nurse practitioner on the grounds that (a) it was inconsistent with the stress tests results and recent cardiac catherization, which carried more weight than a report prepared exclusively for compensation purposes, and (b) resolving inconsistencies was his responsibility. (Id. at 18.) Further detracting from Plaintiff's description of disabling musculoskeletal, psychological, and shortness of breath symptoms were the notes of his visits to Dr. Vaid's office which often showed him to have a normal gait, station, judgment, mood, affect, and respiration and did not show him to have any motor, sensory, or reflex abnormalities. (Id.) When in the hospital in January 2007, Plaintiff had no cyanosis (bluish discoloration of the skin) clubbing or edema in his extremities or any focal neurological deficits, but did have normal muscle tone and strength. (Id.) The examination notes of Dr. Thampy routinely showed Plaintiff to have normal muscle tone, strength, and gait and no depression or difficulty standing. (Id.) His affect was good; he was pleasant and cooperative. (Id.) Blood tests showed fairly good control of his diabetes. (Id.) An x-ray of his right knee was fairly unremarkable, although he did have some osteoarthritis and spurring in his feet. (Id.) And, although Plaintiff testified that he was not on a diabetic diet, he had been placed on one on his release from the hospital in January 2007 and again in June 2008. (Id.) Additionally, the ALJ noted, Plaintiff had stopped working because of an argument with his boss and not because of his impairments. (Id.) His attribution of the argument to anger issues was not supported by the lack of a medically determinable anger management impairment and of any severe mental impairment. (Id.) The ALJ also noted that Plaintiff had

a good work history with good wages; thus, his anger problem did not preclude him from working. (Id.) The ALJ then concluded that Plaintiff had the RFC to perform a full range of light work.[7] (Id. at 19.)

At step four, the ALJ concluded that Plaintiff's RFC precluded him from returning to his past relevant work. (Id.)

At step five, the ALJ applied the Medical-Vocational Guidelines and concluded that given Plaintiff's age, his limited education, his ability to communicate in English, and his RFC, he was not disabled within the meaning of the Act. (Id. at 19-20.)

### Additional Medical Records Before the Appeals Council

After the ALJ rendered his decision, Plaintiff submitted to the Appeals Council additional medical records from St. Anthony's.

Plaintiff was admitted to St. Anthony's on January 6, 2009, with cellulitis in his right elbow and released the next day after antibiotics reduced the swelling and pain. (Id. at 462-67.) His medical history included constant back, knee, and feet pain since 2007. (Id. at 464.) The pain at its worse was a seven on a ten-point scale and a six at its best. (Id.) It was thought the cellulitis was caused by a spider bite. (Id. at 466.)

On May 4, Plaintiff was seen at the emergency room at St. Anthony's. (Id. at 447-61.) His blood sugar levels were high; he denied being in pain. (Id. at 449.) He was reported to have been drinking alcohol since the age of 12 and drank at least 40 beers on the weekend.

_____

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

(Id. at 449, 450.)  He had been drinking for the past three days.  (Id. at 451, 454.)  He lived alone, but his daughter lived nearby.  (Id. at 450.)  On his discharge the following morning, Plaintiff's diagnoses included alcohol abuse.  (Id. at 459.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(b).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  "The sequential evaluation

- 25 -

process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a

sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R. § 220.130(a). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord

**Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ fatally erred when (1) assessing his RFC, having (a) not given the proper weight to his cardiologist's rating of his heart disease as Class II and to the nurse practitioner's assessment and (b) not fully and fairly developing the record, and (2)

relying on the Medical-Vocational Guidelines and ignoring his significant nonexertional impairment, i.e. pain.

As discussed above, Plaintiff has the burden at step four of establishing his RFC. See **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738. Plaintiff argues that the ALJ failed in his duty when giving improper weight to the cardiologist's rating of his heart disease as Class II, see page 20, supra, and to the RFC assessment completed by a nurse practitioner, see pages 20 to 21, supra.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). Title 20 C.F.R. § 416.927(d) delineates six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 416.927(d)(1)-(6). "The weight given a treating physician's opinion is limited if the opinion

consists only of conclusory statements." **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

Plaintiff first saw a cardiologist with Gateway Cardiology in November 2006. In January 2008, Dr. Younis, one of four cardiologists in the practice, rated Plaintiff's heart disease. In the interim, Plaintiff had routine, follow-up visits with one of the three other cardiologists in the practice. The month before Dr. Younis's rating – done the month before she would treat Plaintiff – Plaintiff was treated by Dr. Bassam Al-Joundi. That occasion was a follow-up visit at which Plaintiff's only complaint was of a mild shortness of breath when exercising. His coronary artery disease and his hypertension were both described as being well-controlled. Although Plaintiff had complained of left-sided chest pain at his prior visit to Gateway Cardiology, he had described the pain as being recurrent, sporadic, and lasting for a few minutes. He had been working on his house. Acting on the recommendation of the cardiologist, Dr. Tammam Al-Joundi, Plaintiff had a stress test and ECG, following which Dr. Al-Joundi continued Plaintiff on the same treatment regimen and advised a follow-up appointment in three months. Plaintiff did not return for six months.[8]

Thus, Dr. Younis did not have an examining or treatment relationship with Plaintiff before she classified his heart disease. Nor is that classification consistent with, or supported

---

[8]Indeed, when Plaintiff saw the nurse practitioner at Dr. Vaid's office in August, one month after he was to have had a follow-up appointment with Gateway Cardiology, it was recommended that he follow-up with Gateway. The following month, the nurse practitioner recommended it again.

by, the other cardiologists' treatment notes. The ALJ did not err in not giving greater weight to her classification. See **Clevenger v. SSA**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Randolph v. Barnhart**, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ properly refused to give treating physician's opinion controlling weight when that opinion was in a checklist format and was given after physician had met with claimant only three times).

Nor did the ALJ err in not giving greater weight to the nurse practitioner's RFC assessment of Plaintiff. That assessment was made the same day as Dr. Younis made her classification decision and was based on the same record. There are limitations, however, that are described in the assessment that do not appear in the treatment notes or are not presaged by the notes. For instance, the nurse practitioner opined, without explanation, that Plaintiff's physical symptoms and limitations caused him emotional difficulties. Neither the records of Gateway Cardiology or the contemporaneous records of his other health care practitioners suggested such. The nurse practitioner considered January 2007 as the earliest date the limitations reflected in the RFC applied; however, Plaintiff's 2007 medical records do not include any references to emotional factors, complaints of medication side effects, or of needing to rest if he walked farther than two blocks.[9] They do, however, consistently include references to a normal gait. See **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding

_____

[9]The Court notes that the relevant medical records do include a reference to Plaintiff playing golf and working on his house.

that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); accord **Vandenboom**, 421 F.3d at 749; **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996).

Any deficiencies in the ALJ's RFC should have been corrected, Plaintiff further argues, by the ALJ developing the record on his use of pain medication, his back and knee pain, and his osteoarthritis.

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). This duty requires that the ALJ neutrally develop the facts, **Snead**, 360 F.3d at 838, recontacting medical sources, including treating physicians, and ordering consultative examinations *if* "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). "The ALJ does not[, however,] 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen**, 612 F.3d at 1016 (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). Moreover, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." **Id.**

In the instant case, no crucial issue was undeveloped, nor was there any resulting prejudice or unfair treatment. Rather, the evidence of Plaintiff's osteoarthritis and back and knee pain was insufficient to establish greater restrictions in his RFC than found by the ALJ. See e.g. **Samons**

**v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Plaintiff next argues that the ALJ erred by relying on the Medical-Vocational Guidelines because he has significant non-exertional impairments of pain and anger issues.

"Generally, where the claimant suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational Guidelines." **Baker**, 457 F.3d at 894. "However, the Guidelines still may be used where the nonexertional impairments 'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities.'" **Id.** (quoting Ellis, 392 F.3d at 996). "In particular, '[w]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines].'" **Id.** at 894-95 (quoting Naber v. Shalala, 22 F.3d 186, 189-90 (8th Cir.1994)) (all but second alteration in original).

In the instant case, the ALJ discredited Plaintiff's complaints of pain because they were inconsistent with the record. For instance, his complaints of debilitating knee and ankle pain were inconsistent with the medical records which consistently characterized his gait as normal and, if describing his muscle tone and strength, characterized both as normal. See **Jones v. Astrue**, 619 F.3d 963, 975 (8th Cir. 2010) (factor, albeit not the only one, to be considered when evaluating a claimant's subjective complaints is their lack of support in the objective

medical evidence). Those complaints, including his testimony he could not walk for longer than five minutes, are also inconsistent with such activities as playing golf. "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" **Medhaug v. Astrue**, 578 F.3d 805, 817 (8th Cir. 2009) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001)); <u>accord</u> **Halverson**, 600 F.3d at 932. His testimony that his worst problem, and the one that led to his being fired from his last job, is anger is inconsistent with the lack of any reference to such a problem in the medical records, with the many references in those records to a pleasant or normal affect, with his record of years of steady employment, and with his ability to maintain friendships. <u>See</u> **Id.** at 932-33 (affirming adverse credibility determination when inconsistencies in record, including an ability to "behave[ ] appropriately in her interactions with others," undermined that credibility). Also inconsistent with Plaintiff's complaints was the lack of any functional restrictions placed on him by any of his physicians. <u>See</u> **Moore**, 572 F.3d at 525; **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008).

The ALJ having explicitly discredited Plaintiff's testimony and having "give[n] good reasons for doing so," <u>see</u> **Jones**, 619 F.3d at 975, the Court will defer to that determination. Consequently, because the ALJ did not err in his adverse credibility determination, the ALJ did not err in relying on the Medical-Vocational Guidelines.

## Conclusion

The ALJ's decision that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence on the record as a whole, including that which detracts from

the decision, and is not outside the "zone of choice." <u>See</u> **Heino v. Astrue**, 578 F.3d 873, 879

(8th Cir. 2009). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be

AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days from this date** in which to file

written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1),

unless an extension of time for good cause is obtained, and that failure to file timely

objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  9th  day of November, 2010.